IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MATTHEW GERMAIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| vs. | ) | |
| | ) | FILE NO.: 1:18-cv-03593-AT |
| TOPGOLF USA ALPHARETTA, LLC and | ) | |
| TOP GOLF USA INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

COME NOW, Defendants Topgolf USA Alpharetta, LLC and Top Golf USA Inc. ("Topgolf") and oppose plaintiff's Motion for Sanctions for Spoliation of Evidence as follows:

### I. STATEMENT OF FACTS

This case arose on March 18, 2016 when plaintiff Matthew Germain, while an invitee at Topgolf's sports entertainment venue in Alpharetta, attempted to sit upon a cushioned chair and fell between the chair's bottom cushion and back cushion. (Complaint at ¶¶ 21-26). Photographs taken by Germain immediately after his post-fall examination of the chair show that several of the chair's leather straps had broken and had been tied back together. [Doc. 43, p. 3-4]. Topgolf has

admitted in written discovery that the straps were as depicted in the photographs taken by Germain when he examined the chair. (*Id.*) There is, in other words, no dispute as to the condition of the chair, as photographed and examined by Germain, and Topgolf admits that it breached a duty of care owed to invitees by failing to repair, replace or remove the chair and it will be seeking leave to amend its Answers in order to admit the negligence elements of duty and breach of duty.

When Germain encountered the chair, it was located on the third floor of Topgolf's Alpharetta sports venue, a complex that is open to invitees and which consists of "hitting bays" for golfers, as well as food and beverage areas, private event spaces and meeting rooms. (Deposition of James Lovvorn, "Lovvorn dep." at 21-22, excerpts attached as Exhibit A).

After Germain's fall, Operations Manager Matthew Barkelew ensured that the chair was removed from the public-access venue so that invitees could not encounter it. (Deposition of Matthew Barkelew, "Barkelew dep." at 29, 45, 50, excerpts attached as Exhibit B). Aside from the public-access building, the rest of the interior premises at Topgolf are "staff-only" areas of limited space capacity and these include one maintenance shop and four sheds (each 10' x 10') behind the building which house chemicals, marking materials, uniforms and plateware. (*Id*). The chair was taken to the maintenance shop, which is covered and protected from

the elements. (*Id*. at p. 45, 50, 55). A sign made of white paper and taped with two parallel pieces of tape was placed upon the chair and it was segregated from those areas of the premises where debris and garbage were loaded and segregated additionally from areas where in-use items were stored so that it would not become inadvertently rotated back into use. (*Id*. at 50-51); (Deposition of Robert Rose, "Rose dep." at 74, 79, excerpts attached as Exhibit C).

Over two years elapsed.

It is undisputed that by November 16, 2017 the chair remained preserved and available and plaintiff requested neither inspection nor testing of it. [Doc. 43, p. 6]. The chair remained stored in an area where public invitees would not encounter it and employees were instructed not to remove the chair from its storage area. (Rose dep. at 74, 79). While it is true that maintenance employee Robert Rose saw the chair sitting outside the maintenance shop on <u>one</u> occasion, it is also the case that the maintenance shop, being packed to capacity with facility items, was regularly emptied and reorganized such that the chair may have been moved out of the shop while items were sorted and streamlined. (*Id*. at 74, 79). All other employees who recall seeing the chair saw it stored inside the maintenance shop. (Barkelew dep. at 55) (Lovvorn dep. at 59, 61). At some point, the chair could no

3

longer be found anywhere on the premises and Topgolf's employees are uncertain what happened to it. (Barkelew dep. at 55) (Lovvorn dep. at 58).

A second and identical (albeit with straps attached) exemplar chair exists and sits available for inspection and testing. (Deposition of Carrie Culbertson, "Culbertson dep." at p. 94, 105-106, excerpts attached as Exhibit D). The chair was located at another TopGolf facility and the manufacturer is the same. Since October 25, 2018, plaintiff has been aware that this exemplar chair exists for such purpose but plaintiff has not undertaken any measures of testing or inspection on this chair. *Id*.

As plaintiff admits, four photographs of the subject chair were taken immediately after the incident by Germain himself such that photographic evidence of the chair's exact condition on the date of loss also exists. [Doc. 43, Exhibits C-F].

As stated, Topgolf does not dispute Germain's description of the condition of the chair. It admits that it owed a duty to invitees such as Germain to exercise ordinary care in keeping the premises safe and it further admits that it breached this duty by failing to repair, replace or remove the broken chair before Germain encountered it. The sole issue to be determined at trial, therefore, is the extent to which Germain's injuries were caused by, and his medical and special damages

were proximately caused by his fall at Topgolf. As to this issue, Germain's fall

"through" the chair and his medical, wage and employment records are the critical

evidence, not the chair. In fact, Germain and his attorneys can remove the straps,

as the straps are adhered by clips onto the back, and both test the chair and

demonstrate for the jury the nature of the fall. As it is not crucial evidence such as

to come within the scope of the spoliation doctrine, and as the plaintiff has not met

his burden of showing the requisite elements of a spoliation claim, the instant

motion should be denied.

## II. LEGAL ARGUMENT

### A. Plaintiff's motion is not ripe for review as the procedural predicates for filing it have not been met.

As a preliminary matter, Topgolf shows that the Court's Standing Order

states that "[t]he parties shall not file discovery motions (including . . . motions for

sanctions) without prior permission from the Court." *See*, Standing Order, dated

November 26, 2019. Here, the Court had not yet granted permission for the

plaintiff to file the instant motion for sanctions, nor had the plaintiff sought leave

to file such a motion.

Further, the parties are required to confer in good faith in an effort to resolve

any discovery dispute and if the dispute cannot be resolved, "the parties shall file

on the case docket via the CM/ECF a Consolidated/Joint Discovery Statement

outlining their positions on each of the discovery items in dispute" and once this is submitted, "[t]he Court will determine whether the dispute can be resolved on the papers or whether a conference is necessary and will notify the parties accordingly" and "will direct further proceedings." *Id*.

Here, the Court has been unable to direct further proceedings, and, indeed, determine whether this dispute can be resolved, as Germain has filed the instant motion prior to the submission of the requisite Consolidated/Joint Discovery Statement. Because TopGolf believes this issue can be resolved without turning to a motion for sanctions, TopGolf requests that Germain be required to comply with the Court's Standing Order and the prerequisites to moving for sanctions prior to the Court's consideration of the instant motion.

B. **To the extent that the Court will consider the plaintiff's motion, it is without merit as the particular chair involved is not crucial to Plaintiff's case and an exemplar chair exists for Plaintiff's use**.

A party seeking sanctions must prove that (1) the missing evidence existed at one time; (2) the defendant had a duty to preserve the evidence; and (3) the evidence was crucial to the plaintiff's prima facie case. *Marshall v. Dentfirst, P.C.*, 313 F.R.D. 691, 694 (N.D. Ga. 2016) (citing *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011)).

In considering the particular spoliation sanction to impose, "courts should consider the following factors: (1) prejudice to the non-spoliating party as a result of the destruction of evidence, (2) whether the prejudice can be cured, (3) practical importance of the evidence, (4) whether the spoliating party acted in good or bad faith, and (5) the potential for abuse of expert testimony about evidence not excluded. *In re Delta*, 770 F. Supp. 2d at 1305 (citing *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005)) (emphasis added).

An analysis of these elements militates against a finding of spoliation.

1. **Plaintiff fails to prove the requisite causal connection between the alleged spoliation and his inability to prove his case**.

Sanctions for spoliation are properly denied where the plaintiff cannot show that the actual destruction of the evidence led to the inability to prove his case. *Green Leaf Nursery v. E.I. DuPont de Nemours and Company*, 341 F.3d 1292 (11th Cir. 2003) (dismissing spoliation claim). As a rule, sanctions are not imposed where there has been no prejudice to a party as a result of the destruction of evidence. *Gratton v. Great American Communications*, 178 F.3d 1373 (11th Cir. 1999) (Rule 37 discovery sanctions are intended to prevent unfair prejudice to litigants). To establish prejudice, plaintiff must show a reasonable possibility based on concrete evidence that access to the lost material would have produced evidence favorable to his cause. *In re: Daimler Chrysler AG*, 2003 WL 22951696, *2 (D.

7

Del. 2003). The burden of establishing prejudice must be shown by direct evidence which is clear and convincing when dispositive sanctions are sought. *Daimler Chrysler*, at *2, n.2.

Here, Germain's spoliation allegation fails due to the absence of any showing that the absent chair causes a significant impairment of his ability to prove his lawsuit. Plaintiff admits that he possesses photographs of the chair showing its precise condition immediately after he fell. He himself documented his fall by photographin the exact chair in its condition immediately post-fall. Since October 25, 2018 an identical exemplar chair has been available for plaintiff to inspect or test but he has not done so. Moreover, defendants do not dispute the condition of the chair, as described by plaintiff himself, and admit the negligence elements of duty and breach of duty. The chair is not crucial to the sole remaining issues which address the extent of Germain's injuries, whether they could have occurred as alleged, medical and special damages and the causation of same. Indeed, it is the case that "[w]here, as here, the moving party is not able to establish that the allegedly destroyed evidence is critical to the case, courts have consistently refused to impose spoliation sanctions." *In re Delta/Airtran Baggage Fee Antitrust Litigation, Heath v. Wal-Mart Stores East, LP*, 697 F.Supp.2d 1373 (N.D. Ga. 2010) (refusing to impose spoliation sanctions in part because the missing evidence

was "only part of the puzzle"); *Frey v. Gainey Transp. Servs., Inc.*, No. 1:05-cv-1493-JOF, 2006 U.S. Dist. LEXIS 59316, at *8-9 (N.D. Ga. Aug. 22, 2006) (finding no prejudice because the missing evidence was "not crucial" to the plaintiff's claims); *Petcou v. CH Robinson Worldwide, Inc.*, No. 1:06-cv-2157-HTW-GGB, 2008 U.S. Dist. LEXIS 13723 (N.D. Ga. Feb. 25, 2008) (denying spoliation sanctions because among other things "the resulting prejudice to Plaintiff was relatively minor given other available evidence"). Without any clear and convincing evidence of prejudice, plaintiff fails to sustain his burden of proof as to this requisite element.

**2. Any conceivable prejudice in connection with the plaintiff's only remaining elements of proof (proximate cause and damages) can be cured through the inspection and/or testing of an identical exemplar chair.**

Germain asserts that he is prejudiced because "[t]he subject chair can never be returned or replicated in any way to allow for meaningful inspection." [Doc. 43 at p. 15]. However, the defendants do not dispute that the condition of the chair was as the plaintiff described in his deposition and as shown by the post-fall photographs produced by Germain after he examined the chair. To the extent that Germain believes the chair is necessary to show the mechanism of injury in support of his proximate cause argument, an identical specimen chair, which defendants have made available for any testing, examination or inspection by

plaintiff, cures any potential prejudice. *Zeitz v. Innsbruck Golf Resort, Inc.*, 2016 U.S. Dist. LEXIS 146601 (N.D. Ga. Oct. 24, 2016) (denying plaintiff's motion for spoliation based on the destruction of a golf cart and course signage used when his accident occurred because photographs existed of the signage and "any prejudice plaintiffs may suffer from the absence of the signs can therefore be cured by the use of the photograph and by the questioning of Deputy Maddox.") The absence of this element provides a second, mutually exclusive ground for denial of plaintiff's spoliation motion.

### 3. As the condition of the chair was only relevant to the now-admitted element of defendants' breach of duty of care, the *original* chair is of no practical importance as evidence.

As to this element, the plaintiff argues that the chair "would have conclusively established the presence of negligent maintenance of the chair at Top Golf" and "[w]ithout the ability to look at, measure, examine and/or test the chair, Plaintiff cannot have an expert testify why the chair was unsuitable for use as of March 18, 2016." [Doc. 43 at 16]. However, Topgolf admits that it negligently maintained the chair and that it was unsuitable for use and thus, the very elements that render the chair important are not in dispute. To the extent that Germain believes the chair is necessary to show the mechanism of injury in support of his

proximate cause argument, an identical specimen chair cures any potential prejudice such that this element, like the two preceding it, is lacking.

### 4.  There is no evidence of bad faith.

In the Eleventh Circuit, "[m]ere negligence in losing or destroying evidence is not enough to impose sanctions, as it does not sustain an inference of consciousness of a weak case." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). An adverse inference from the party's failure to preserve evidence is allowed "only when the absence of that evidence is predicated on bad faith." *Id.* at 931; *Cox v. Target Corp.*, 351 Fed. Appx. 381, 383 (11th Cir. 2009) (denying motion for adverse jury instruction on spoliation absent showing of bad faith). A showing of bad faith requires the plaintiff to demonstrate that a "party purposely loses or destroys relevant evidence." *Id*. Mere negligence in destroying evidence is not sufficient to justify striking an answer. *Mann v. Taser Int'l, Inc*., 588 F.3d 1291, 1310 (11th Cir. 2009).

Here, the chair was immediately removed from public access after Germain's incident and it was segregated from in-use items and debris. Plaintiff admits that it was preserved for at least a year and a half (at least until November 16, 2017). Over two years after the incident, the chair could not be located and upon this realization, an identical chair by the same manufacturer was located from

TopGolf's Midtown venue and was moved to defense counsel's office where it currently sits. The facts show an intention to preserve the chair and, indeed, actual preservation of it, for a significant period before what likely was oversight by an employee caused the chair to become lost. These facts are not tantamount to bad faith. *See, for example, Walter v. Carnival Corp.*, 2010 U.S. Dist. LEXIS 74307 (S.D. Fla. July 23, 2010) (denying spoliation motion based on defendant losing a chair that collapsed and caused plaintiff's injury because there was no evidence demonstrating the defendant's bad faith in losing the chair: "is appears just as likely, if not more so, that the chair was lost because of negligence, or an oversight by an oblivious crew member in the chain of custody, particularly since [defendant] willingly produced other evidence demonstrating the construction and condition of the broken chair.")

As in *Walter*, the undisputed evidence is that the chair was preserved until at least November 16, 2017 before becoming lost and as Topgolf willingly makes available the identical chair for inspection and testing and does not dispute plaintiff's allegation of the condition and construction of the chair, the evidence does not support an argument of bad faith on the part of Topgolf. This is a fourth, mutually exclusive ground for denying plaintiff's motion.

### 5.  There is no potential for abuse of expert testimony.

There is no potential for abuse of expert testimony to establish the condition

of the chair because its condition, as described by the plaintiff, is not in dispute.

Expert testimony is therefore not needed on these elements and, indeed, Topgolf

has neither proffered an expert to testify as to the condition of the chair, nor has it

consulted with any expert as to the chair's condition.

As to the causation of the plaintiff's medical damages, to the extent that the

plaintiff seeks to utilize expert testimony, an exemplar chair of an identical make

and model is available for testing and inspection. Plaintiff has failed to show how it

could possibly be unreliable for an expert, armed with photographs of the condition

of the subject chair taken immediately post-fall by Germain himself, to conduct

testing on an identical specimen chair to determine causation. On this issue, the

cases that the plaintiff cites are inapposite. *Graff v. Baja Marine Corp.*, 310 Fed.

Appx. 298 (11th Cir. 2009) (in which a team hired by plaintiff's attorneys

intentionally removed hardware from the boat at issue for the sole purpose of

conducting destructive tensile tests upon it without notifying the opposing party

such that what little material was left over from the testing was insufficient to

satisfy the ASTM's testing requirements); *Flury v. Daimler Chrysler Corp.*, 427

F.3d 939 (11th Cir. 2005) (involving the intentional sale of the subject vehicle for

salvage; loss of the vehicle's airbag control module prevented the defendant from testing the plaintiff's theory that the airbag was defective). Unlike in *Graff* and *Flury*, there is no evidence of any intentional act — particularly no evidence of intentional destructive testing, or testing of any kind by Topgolf — and no evidence that expert testing upon an identical chair would be insufficient to establish the mechanism of Germain's alleged injuries.

It is the case that the plaintiff is "required to demonstrate that the Defendants 'purposely los[t] or destroy[ed] relevant evidence.'" *Griffin v. New Prime, Inc.*, 2014 U.S. Dist. LEXIS 3482 (N.D. Ga. Jan. 13, 2014) (finding that "plaintiffs do not offer any evidence to suggest that Defendants knowingly moved the tractor-trailer forward after the collision, and thereby erased the "black box" data). There is no evidence of affirmative or intentional behavior here. To the contrary, it is undisputed that the chair was preserved for at least a year and a half and as in *Walter, supra*, "plaintiff has failed to present direct or circumstantial evidence demonstrating [defendant's] bad faith in losing the chair, or evidence showing that [defendant] engaged in an intentional affirmative act causing the chair to be lost." 2010 U.S. Dist. LEXIS 74307 at *6. In *Walter*, the defendant "apparently intended to preserve the chair and ha[d] no information about its disappearance, other than speculation that it was lost on account of 'mere negligence' by the employees

charged with keeping track of it" and, as here, any loss of the chair was mitigated by "information about the manufacturer of the chair and investigative reports and photographs provided to [the plaintiff]" such that, where the plaintiff's spoliation motion was denied in *Walter*, so too should it be denied here. Germain has not carried his burden of proving the requisite elements of a spoliation claim.

## III.   CONCLUSION

For the above-stated reasons, defendants request that Germain be required to comply with the Court's Standing Order and the prerequisites to moving for sanctions prior to the Court's consideration of the instant motion. Moreover, because Germain has not carried his burden of proving the requisite elements of a spoliation claim and it thus should be denied on its merits

This 29th day of April, 2019

RUTHERFORD & CHRISTIE, LLP

*/s/ Carrie L. Christie*
Carrie L. Christie
Georgia State Bar No. 125248

225 Peachtree Street Northeast
South Tower, Suite 1750
Atlanta, Georgia  30303
(404) 522-6888

# EXHIBIT A

MATTHEW GERMAIN vs TOPGOLF USA ALPHARETTA
JAMES LOVVORN on 10/25/2018

Page 18

1    Q. What departments are those, sir?
2    A. The food and beverage manager, golf services
3    manager.
4    Q. I'm sorry?
5    A. Golf services manager.
6    Q. Okay.
7    A. Executive chef, director of sales, and the
8    facilities manager.
9    Q. Does the office manager fall under you or no?
10    A. That's probably gray.
11    Q. Gray area?
12    A. I mean, she's directly, yes, underneath me by
13    tree, but she reports to the director of operations.
14    Q. Okay. The one -- the five you listed, do
15    they report directly to you, or does any one of those
16    report directly to the director of operations?
17    A. They -- those specifically report to the
18    operations manager.
19    Q. Okay. Who is currently the food and beverage
20    manager?
21    A. Malika Bailey.
22    Q. Do you know who the food and beverage manager
23    was back in March of '16?
24    A. I believe it was Dylan Gasque-Moss,
25    G-a-s-q-u-e, hyphen, Moss, M-o-s-s.

Page 19

1    Q. Okay. Is Mr. Gasque-Moss, is he still within
2    the Topgolf --
3    A. No.
4    Q. -- family?
5    A. No.
6    Q. Do you know approximately when he left?
7    A. It would have been January -- December or
8    January of the end of 2017.
9    Q. Was he fired, or did he voluntarily leave?
10    A. He was terminated.
11    Q. For what was he terminated?
12    MR. DENNIS: Object to the form.
13    BY MR. MARIGLIANO:
14    Q. For what reason?
15    MR. DENNIS: Object to the form. You can
16    answer.
17    A. Violation of policy.
18    BY MR. MARIGLIANO:
19    Q. Was it coming in late? What was the policy
20    he violated?
21    A. Drinking on the job.
22    Q. Is that a one strike and you're out policy?
23    A. Yes.
24    Q. Speaking of policies and procedures, if you
25    wanted to look at a particular policy and procedure,

Page 20

1    where would you go or what would you do to access that
2    procedure or policy?
3    A. We have a handbook located in our ops office
4    or office -- admin office.
5    Q. Is that admin office and what I'll just call
6    the main building at Topgolf where the golfing occurs?
7    A. Uh-huh.
8    Q. That's a yes?
9    A. Yes.
10    MR. DENNIS: What you're talking about there,
11    are we talking about now or at what time period are we
12    talking about?
13    MR. MARIGLIANO: Now.
14    BY MR. MARIGLIANO:
15    Q. Has -- has --
16    A. Yeah. We have an office -- yes, and -- at
17    Topgolf in Alpharetta, yes.
18    Q. Okay. From earlier depositions, I understand
19    there's a maintenance shop or building that's separate
20    and detached from the main building. Is that correct?
21    A. They're not exactly -- they're attached to
22    the main building, but they're -- how do I describe
23    it? It's like off from the main, from guest view --
24    Q. Okay.
25    A. -- if that would make -- give a better

Page 21

1    visual. We don't have anything that's separating the
2    building. That's --
3    Q. All right. I may have got it wrong. But I
4    -- what I visualize -- I asked Mr. Rose -- if one is
5    standing in the main parking lot and looking at the
6    front entrance, so the highway's to your left, the
7    entrance is in front of you, I thought he said there
8    was a maintenance shop to the right --
9    A. There is, but it's attached to the building.
10    Q. It is attached.
11    A. Yeah.
12    Q. Okay. Can someone walk from -- what do you
13    call the main building? Can I just call it main
14    building, or what do you refer to it as?
15    A. The venue.
16    Q. All right. Can you walk from the venue to
17    the -- the maintenance shop and be enclosed the whole
18    time, or do you have to walk --
19    A. Yes.
20    Q. Okay.
21    A. No. You can be -- you're enclosed the whole
22    time.
23    Q. Okay. Are there any other buildings or parts
24    of the main venue other than the venue and the
25    maintenance shop? Like any other side buildings or

MATTHEW GERMAIN vs TOPGOLF USA ALPHARETTA
JAMES LOVVORN on 10/25/2018

Page 22

1  sheds or anything like that?
2      A. We have three -- I'm sorry -- four sheds that
3  are behind the building for storage.
4      Q. Okay. What -- what kind of things are stored
5  there?
6      A. Chemicals, cleaning chemicals, marking
7  materials, uniforms, plateware --
8      Q. I'm sorry?
9      A. Plateware.
10     Q. Oh, dishes?
11     A. Yeah, dishes.
12     Q. Got you.
13     A. Very minimal things that are -- that we don't
14 have the space for in the main venue.
15     Q. Understood.
16         How -- how big of a -- are they like one room
17 sheds?
18     A. Uh-huh.
19     Q. Yes?
20     A. Probably 10 by 10.
21     Q. 10 by 10?
22     A. Yeah.
23     Q. Okay. For instance, could you fit a chair in
24 one of those sheds?
25     A. You sure could.

Page 23

1      Q. Okay. And that would be enclosed and away
2  from the elements.
3      A. That's correct. Yes.
4      Q. All right. Golf services manager, give me a
5  general understanding of what you understand them to
6  do on a day-to-day basis. What's their role?
7      A. The execution of the check-in of the building
8  and then the execution of the game. I mean, we have
9  retail as well.
10     Q. Are they the guys that hand you the ball and
11 hand you the club, go up there, show you the bay, show
12 you how to work the game?
13     A. Under that umbrella, yes.
14     Q. Okay.
15     A. The check-in person. I'm not sure how else
16 you would say that.
17     Q. That's fair enough.
18         What is -- who is the golf service manager
19 currently?
20     A. Scott Crouse.
21     Q. Is the Krouse with a K?
22     A. C, C-r-o-u-s-e.
23     Q. And who was the golf service manager in March
24 '16, if you know?
25     A. It might have been Dani. We've had a couple

Page 24

1  change through --
2      Q. Sure.
3      A. -- and I didn't keep up with dates.
4      Q. Sure.
5      A. So it could have been a young lady by the
6  name of Dani.
7      Q. Do you know her last name?
8      A. Jefferson.
9      Q. Did -- did she voluntarily leave, or was she
10 fired?
11     A. She — I can't answer that for you. I don't
12 know. I don't -- she no longer works with Topgolf,
13 and I don't have the answer of why.
14     Q. But she worked there when you worked there.
15     A. Yes.
16     Q. Do you ever play a role in the hiring or
17 firing of somebody, or is that not your
18 responsibility?
19     A. I do.
20     Q. Okay. Do you have sole authority to hire or
21 fire?
22     A. I do not.
23     Q. Okay. Does the director of operations have
24 sole authority to hire and fire?
25     A. Sure does.

Page 25

1      Q. Okay. So hiring and firing is not something
2  that needs to be approved by the home office in
3  Dallas.
4          MR. DENNIS: Object to form.
5      A. That's — yeah. That's —
6  BY MR. MARIGLIANO:
7      Q. Or is it?
8      A. That depends on the particular situation.
9      Q. Okay. Are there times to your knowledge that
10 the director of operations can hire or fire somebody
11 without getting the okay from home office? Are you
12 aware of that one way or the other?
13         MR. DENNIS: Same objection.
14     A. Not that I'm aware of, no.
15 BY MR. MARIGLIANO:
16     Q. Okay. Who is -- is there a hiring committee
17 that's the same two, three, four, five people?
18     A. It rotates.
19     Q. Are you always on it, though?
20     A. No.
21     Q. Is the director of operations always on it?
22     A. No.
23     Q. So there will be times department heads,
24 people below you on the corporate hierarchy are the
25 ones that are on the hiring committee?

MATTHEW GERMAIN vs TOPGOLF USA ALPHARETTA
JAMES LOVVORN on 10/25/2018

Page 58

1 circumstances leading to Mr. Germain's incident?
2    A.  No.
3    Q.  Okay.  So before attorneys got involved, you
4 had as much information as the guy on the street about
5 Mr. Germain's incident.
6    A.  All I know is that there was a guest
7 incident, removed the chair, that's the chair.  That's
8 all I know.
9    Q.  Okay.  Do you know whose decision it was to
10 remove the chair from that area in Topgolf?
11    A.  I don't have that answer for you.  No.
12    Q.  Do you know if the chair was removed
13 immediately from that area, or was it a week or a
14 month later?
15    A.  I don't recall.
16    Q.  Do you know where the chair was moved to
17 following this incident?
18    A.  Don't recall.
19    Q.  Do you know any of the circumstances as to
20 how or why the chair is no longer at Topgolf?
21    A.  I have no idea.
22    Q.  Okay.  Do you know anything about where that
23 chair is currently?
24    A.  No clue.
25    Q.  Okay.  Have you ever seen the chair that was

Page 59

1 involved in this incident?
2    A.  I saw it in the shop one time, verified was
3 that the chair that was at — asked to be removed,
4 yes, that was the chair, and I never thought again
5 about it.
6    Q.  Okay.  If you go to Exhibit 2, sir --
7    A.  Okay.
8    Q.  -- somewhere in there there -- there's a
9 picture of a chair.  Let me know when you get there.
10    A.  Okay.  Cool.  Is that it?  Yeah.
11    Q.  Okay.
12    A.  Okay.
13    Q.  Exhibit 2, does that -- other than perhaps
14 the positions of the cushion, does that look like the
15 chair that you saw in the shop at some point, or was
16 it a different chair?
17    A.  It looks very similar.
18    Q.  Okay.  When you say "in the shop," do you
19 mean the maintenance shop?
20    A.  Yes.
21    Q.  Okay.  What was the occasion, what was the
22 reason you went to the maintenance shop to see this
23 chair?
24    A.  I believe I was passing through the shop.
25    Q.  All right.  So you were not there for the

Page 60

1 sole purpose --
2    A.  No.
3    Q.  -- of seeing the chair?
4    A.  No.
5    Q.  All right.
6    A.  I saw it as I was passing through and said,
7 "Hey, is that the chair?"
8       "That's the chair."
9       "Okay.  Cool."
10    Q.  Who did you -- who did you ask?
11    A.  I don't recall.
12    Q.  Somebody with the maintenance department?
13    A.  Probably.
14    Q.  And when you said, "Is that the chair?" did
15 that person understand that you were talking about a
16 chair involving the incident in March?
17    A.  It was the chair that was to be out of
18 service.  It was just the specific chair that's
19 supposed to be out of service.  Yes.  Okay.
20    Q.  Okay.
21    A.  Because otherwise I would have asked, "Hey,
22 why is this not back on the floor?"
23    Q.  I got you.
24       All right.  When you -- do you only recall
25 seeing this chair one time?

Page 61

1    A.  That's it.  One time.
2    Q.  Okay.  When you asked, "Is this the chair
3 that's out of service?" did you know only that it was
4 out of service or did you know the reason why it was
5 taken out of service?
6    A.  Just it was out of service due to a guest
7 incident.
8    Q.  Okay.
9    A.  And that's -- because I wasn't involved.  I
10 didn't pay any more attention to it.
11    Q.  Do you know who the person was that said,
12 "Hey, we took a chair out of service, and it's in the
13 maintenance shop"?
14    A.  I cannot remember.
15    Q.  Okay.  And we're talking the maintenance
16 shop, we're talking that structure to the right you
17 say that's kind of attached to the venue?
18    A.  Well, it's fully attached.
19    Q.  Fully attached.
20       And when you saw it, was it covered, like it
21 was inside where rain couldn't get at it?
22    A.  That's correct.
23    Q.  All right.  When you saw it, were there any
24 signs or stickers or tags on it saying "Do not throw
25 away," "Don't discard any" --

# EXHIBIT B

MATTHEW GERMAIN vs TOPGOLF USA ALPHARETTA
MATTHEW BARKELEW on 11/08/2018

Page 29

1    your role in this event?

2       A.   I -- I remember a few seemingly minute

3    details of the interaction, but that's unfortunately

4    about it.

5       Q.   Let's do this, I'm going to ask you obviously

6    very specific questions.

7       A.   Sure.

8       Q.   If you don't have independent recollection,

9    just tell me.

10      A.   Okay.

11      Q.   And then if you're like, "Hey, I don't know.

12   But if I can look at Ashley's report," let me know

13   that, too, because I'm trying to focus what you recall

14   vs. what you see on paper.

15      A.   Of course.

16      Q.   Okay.  Great.  Do you know how it was that

17   you first learned there was an incident involving a

18   customer on the third floor that night?

19      A.   To my recollection, I want to say I received

20   a radio call and that's what brought me up there.

21      Q.   Radio call, do you all have like

22   walkie-talkies --

23      A.   Uh-huh.

24      Q.   -- you carry?

25      A.   Yes, sir.

MATTHEW GERMAIN vs TOPGOLF USA ALPHARETTA
MATTHEW BARKELEW on 11/08/2018

Page 45

1      A.  You're saying if I saw this chair, would I
2    remove it?
3      Q.  Yes, and ask someone to assess whether it's
4    in fair working condition or not.
5      A.  I think that's fair.
6      Q.  Okay.  Did you accompany Mr. Germain or his
7    friend down to the parking lot where they eventually
8    left, or did they leave on their own accord without
9    you?
10     A.  I don't specifically recall escorting them.
11     Q.  It -- it sounds like -- and please correct me
12   if I'm wrong -- you showed up, realized Ashley kind of
13   had it handled, had the interaction you described, and
14   kind of let Ashley finish it because she had arrived
15   there first.  Is that --
16     A.  Yes, sir.
17     Q.  -- accurate?
18        Okay.  After you left that evening, do you
19   know if the chair was removed during that shift or do
20   you know what happened?
21     A.  To my recollection, the chair was removed,
22   placed in our maintenance shop.
23     Q.  Do you know who removed the chair?
24     A.  I do not.
25     Q.  And do you believe it was removed that shift

MATTHEW GERMAIN vs TOPGOLF USA ALPHARETTA
MATTHEW BARKELEW on 11/08/2018

Page 46

1   before Topgolf closed that night?

2       A.  I have no reason to believe otherwise.  Yeah.

3       Q.  Okay.  And my -- my question is, do you

4   actually recall that, or do you just believe from your

5   habit, custom, and practice you would have, but you

6   don't have a distinct recollection of that taking

7   place?  I'm trying to separate what you do recall --

8       A.  Right.

9       Q.  -- vs. what you think happened just knowing

10  how you operate.

11      A.  I -- I do not specifically recall it being

12  removed that shift or me seeing it removed that shift,

13  but that would be my assumption.

14      Q.  Okay.  Who, if anyone, would have been the

15  person to say, "We need to remove this"?  Who would

16  have been the person that facilitated that removal?

17      A.  It really would have been anyone.  But I --

18  in this scenario, I would assume Ashley would have had

19  it removed.

20      Q.  Okay.

21      A.  Or a maintenance associate.

22      Q.  And I'm sorry.  I think you told me.  At the

23  time you left, you were not aware of the condition of

24  the straps, correct?

25      A.  At the time I left the scene?

AHREPORTING, LLC

(970)231-0859
ahreporting@gmail.com

Page 50

1      A.   No.   Topgolf Alpharetta, you know, I probably

2   would have spoken with my director of operations about

3   it.   That's probably the extent of it.

4      Q.   So have you had any discussions, other than

5   logistics of this deposition with counsel or with

6   Carrie, any substantive conversation with anybody at

7   Topgolf about your observations, your opinions, your

8   conclusions that night?

9      A.   No.

10     Q.   Do you know where that chair went?  Whatever

11  date it was when it left that area, where did it go

12  to?

13     A.   It went to the maintenance shop.

14     Q.   Okay.  And do you -- is that because you know

15  it went to the maintenance shop --

16     A.   Uh-huh.

17     Q.   -- based upon personal observation or --

18     A.   I did.  I recall seeing it over -- I want to

19  say over in the corner by the handwash station.  It

20  had -- I remember vaguely it had like two parallel

21  pieces of tape on it holding a white piece of paper

22  sign.  I don't recall what it said, but I do remember

23  seeing it.  I went to visit Thor in his shop

24  regularly.

25     Q.   When was the last time you recall that chair

Page 51

```
 1    being in the maintenance shop?
 2        A.  I'm not confident enough to put a date on
 3    that.  I'm sorry.
 4        Q.  Do you recall seeing it there like once or
 5    like a number of times?
 6        A.  I feel like I saw it there more than once.
 7        Q.  Let me show you what was marked as Exhibit 12
 8    to Mr. Lovvorn's deposition.  And this has already
 9    been admitted.  But take whatever time you need and --
10    and just read that.
11            MR. MARIGLIANO:  Bless you.
12            MR. GERMAIN:  Thank you.
13            MR. DENNIS:  Bless you.
14            MR. GERMAIN:  I appreciate it.
15        A.  Okay.
16    BY MR. MARIGLIANO:
17        Q.  Do you recall getting this letter?
18        A.  Vaguely now that I'm seeing it.
19        Q.  Do you recall what you did once you received
20    this letter?  Like do you forward it to Greg, or do
21    you send it to Dallas?
22        A.  I really don't.  You know, we get hundreds of
23    e-mails in a day.  I -- I -- I really don't recall
24    what I did with that.
25        Q.  Okay.  Do you understand that this letter --
```

MATTHEW GERMAIN vs TOPGOLF USA ALPHARETTA
MATTHEW BARKELEW on 11/08/2018

Page 55

1   image of, you know, the two parallel pieces of tape

2   being wrapped -- kind of wrapped around it.

3       Q.  Like duct tape, scotch tape?

4       A.  I want to say it was clear -- clear tape.

5       Q.  Okay.

6       A.  But I -- again, I --

7       Q.  And there was a what?

8       A.  -- I can't -- can't confirm that 100 percent.

9       Q.  There was a white piece of paper?

10      A.  I want to say, yeah, it was parallel because

11  it held kind of like -- you know, held a piece of

12  paper up, so a piece here and a piece here.

13      Q.  But you don't recall what it said.

14      A.  I don't.

15      Q.  Okay.  Do you know what happened to that

16  chair?

17      A.  I don't.

18      Q.  Okay.  Did you ever see the chair sitting

19  outside the maintenance shop?

20      A.  No.

21      Q.  Okay.  Do you have any idea of when that

22  chair was no longer at the Topgolf premises in

23  Alpharetta?

24      A.  No.

25      Q.  Okay.  And do you have any idea where that

# EXHIBIT C

Page 74

```
 1      A.   Yes.

 2      Q.   Okay.  And Thor told you that the chair

 3   needed to be kept there because there may be a lawsuit

 4   pending or there was a lawsuit pending?

 5      A.   I don't know exactly --

 6      Q.   Okay.

 7      A.   -- what he said, but it was something

 8   pertaining to a lawsuit.  And that's all he had to say

 9   to me.

10      Q.   Okay.

11      A.   So I left it there.

12      Q.   But he made it known to you that that chair

13   was to -- was not to be removed.

14      A.   Yes.

15      Q.   Okay.  And so did you actually ever inspect

16   the chair, look at the chair?  Other than notice the

17   chair, did you look underneath it, to the --

18      A.   No.  I didn't pay no mind at all.

19      Q.   Okay.

20      A.   Just hooked up the machine and went to work.

21      Q.   Okay.  Again, this event happened on March

22   18th, 2016.  We're now in October of '18.  Do you

23   think this occurrence with Thor and noticing the

24   chair, do you think it was in 2018?  Can you limit it

25   to '18, '17, or 16, or do you not even know that?
```

Page 79

1  you said "Sherlock Holmes," so I'm just giving you

2  what I would --

3      Q.  Sure.

4      A.  -- think, you know, would be just --

5      Q.  Yes, sir.

6      A.  I don't know.

7      Q.  When you saw it -- strike that.  Let me ask

8  you, can you only recall that one time seeing the

9  chair?

10      A.  That's all I can recall.

11      Q.  Okay.  Do you recall seeing any signs on it

12  saying "Do not remove," "Do not touch," anything like

13  that?

14      A.  No.

15      Q.  Was there any tape on it, or was there

16  anything around it or on it informing somebody to not

17  throw it away or not discard it?

18      A.  No.

19      Q.  Okay.  So it was just sitting there as a

20  chair with no warning to anybody about not throwing it

21  away.

22      A.  Right.  In a -- in a -- in a -- in an area

23  that normally nothing would be.

24      Q.  Okay.  When -- if there was a time when,

25  let's say, there was a broken table and a broken

(970)231-0859
ahreporting@gmail.com

# EXHIBIT D

MATTHEW GERMAIN vs TOPGOLF USA ALPHARETTA
CARRIE CULBERTSON on 10/25/2018

Page 94

1      MR. MARIGLIANO: Well, I think we're allowed
2  to know at least what the pictures are that were taken
3  so we know if we need to talk with the photographer,
4  if we need to talk to witnesses who might be captured,
5  if there's some other factor that we're not
6  considering. Those pictures, now that the only piece
7  of evidence has disappeared, I think are very telling.
8  I think we're entitled to them.
9      MS. CHRISTIE: I don't have an issue with
10 that. The photos that she has are photos of an
11 exemplary -- of -- of an identical chair. That's all
12 it is. It's -- it's not any photos of this particular
13 chair. It's photos of an identical chair.
14     MR. MARIGLIANO: And I can ask you this off
15 the record.
16     (Off the record.)
17     MR. MARIGLIANO: Let's go back on the record.
18 BY MR. MARIGLIANO:
19     Q. You gave me -- when I asked you who you spoke
20 to at Topgolf, you said the only specific name you
21 told me was Helen, correct?
22     A. That's correct. And -- and just to clarify,
23 when you asked me to speak, I'm not thinking of
24 e-mail. When you say "speak," I'm speaking now. So
25 that's how I took that question.

Page 95

1      Q. Okay. Let's change the question.
2      A. Okay.
3      Q. Any and all communication --
4      A. Uh-huh.
5      Q. -- phone, person to person, text message,
6  e-mail, what specific individuals at Topgolf have you
7  spoken to as it relates to the incident involving Matt
8  Germain, as it relates to a missing chair, as it
9  relates to food and beverage he did or did not
10 purchase, as it relates to injuries he may or may not
11 have other than Helen?
12     A. The only people that were involved in any
13 e-mails that -- from my remembering is e-mails
14 requesting from their investigation, Hey, can you get
15 me this? Can you get me that? And I have to go back
16 to the only people that upward would be a DO or an OM.
17     Q. But I'm asking for specific names.
18     A. That would be Greg Westerholm, Matt Barkelew,
19 or James Lovvorn.
20     Q. Greg, James, or Matt.
21     A. Right.
22     Q. Okay. You have, I believe, told me there is
23 a possibility you communicated with those three. Do
24 you know as you sit here today whether you did in fact
25 communicate with any or all of those persons

Page 96

1  specifically about this matter?
2      A. Specifically, no. I would have to go back to
3  an e-mail or whatever. But, I mean, it's not -- I'm
4  just the middle person in this investigation. So if
5  -- at -- at the venue level. Some of it may have gone
6  to -- to someone else for a request. It might come to
7  me. And I have to go back to Brad, James, Matt and
8  say, "I've got this e-mail from Helen. She's looking
9  for this. Do you have it?"
10     Q. This is my only time to talk to you before
11 trial. This is the only time for me to find out what
12 you know.
13     A. Right.
14     Q. Okay. I'm just trying to find out, do you
15 recall a specific conversation with Greg about this
16 matter?
17     A. I do not.
18     Q. Do you recall a specific conversation with
19 James about this matter?
20     MS. CHRISTIE: Wait. You're -- when you're
21 talking about conversation, you're talking about
22 discussion on the phone or e-mails? Because she's
23 already testified that she did e-mail them. I just
24 want to make sure that --
25     MR. MARIGLIANO: Yes.

Page 97

1      MS. CHRISTIE: -- you're getting the
2  information you want.
3      A. Right. Because, again --
4  BY MR. MARIGLIANO:
5      Q. I'm talking conversation, talking.
6      A. Talk, no.
7      Q. Okay. Any specific conversation with Matt
8  Barkelew?
9      A. No.
10     Q. Okay.
11     A. I would not have any reason to ask verbally
12 other than to e-mail or forward that e-mail request to
13 them looking for the information that someone else is
14 looking for.
15     Q. Okay. Switching gears now. Do you have any
16 personal recollection of communicating with Greg
17 through text, e-mail, or any other fashion about this
18 matter? Greg specifically?
19     A. I mean, yeah. I mean, if I've gotten a
20 request via e-mail for something, he would be the
21 first person I go to via e-mail. These people are
22 looking or this person is looking for whatever. Do
23 you have -- do you have any idea where this would be?
24     Q. Okay. I'm not asking what generally would
25 happened, what the habit would be. I'm just saying,

MATTHEW GERMAIN vs TOPGOLF USA ALPHARETTA
CARRIE CULBERTSON on 10/25/2018

Page 102

1    Q. Did any of those pictures show the – the
2 underside or the backside where strapping may be, or
3 did it only show the front pad that supports the back
4 and the pad that supports the buttocks?
5    A. Again, when I received the request, because I
6 had to go out and find them and brought them -- and
7 the request back was a photo, it was one photo, I
8 turned around, forwarded it, and that was the end of
9 it.
10   Q. Okay. So it was only one photograph you ever
11 saw.
12   A. I don't know. I didn't go through the whole
13 e-mail. I just asked for some -- whatever was asked
14 of me, it was forwarded to me, and I turned around and
15 forwarded it to who requested it.
16   Q. What else did you provide to either Helen or
17 Philadelphia other than perhaps one picture, perhaps
18 more, of a chair?
19   A. I don't -- I don't recall. I mean, I'm not
20 -- I am the middle person, so I'm not part of the
21 investigation. So I'm not digging deep. Again, if
22 she e-mails me or Philadelphia e-mails me, they
23 request something, I get it, and I send it off.
24   Q. Do you know --
25   A. So I don't --

Page 103

1    Q. Go ahead. I'm sorry.
2    A. I'm sorry. I just want to clarify. I don't
3 review the documents, make sure that they're accurate.
4 This is what you asked for, this is what I'm going to
5 give you, and that's all I do. So I am the middleman.
6    Q. Not knowing specifically who you went to to
7 obtain this information, do you know how many
8 different people you went to to obtain whatever
9 information it was that you forwarded on?
10   A. What do you mean?
11   Q. Okay. So I think we've established that
12 usually you would go to Greg, Matt, or James, but in
13 this case, you don't know specifically if you spoke or
14 communicated with one or two or three. Fair?
15   A. Correct.
16   Q. Okay. You do know that you did obtain some
17 information from somebody because you forwarded at
18 least the pictures to either Helen or Philadelphia,
19 correct?
20   A. Correct.
21   Q. Okay. Do you know if the role you played in
22 that process required you to go to just one person for
23 all the information or more than one person?
24   A. Nothing required me to -- there's no
25 requirement. It would just go to all three of them.

Page 104

1 And that would be typical for me to do.
2    Q. Okay. Do you mean that you would send one
3 e-mail to all three and say, "I need X, Y, and Z," and
4 then one or more of those persons would respond and
5 send you that information?
6    A. That's correct.
7    Q. Okay. As you sit here today, you don't know
8 who provided which information. Fair?
9    A. That's correct. I don't remember any of
10 that --
11   Q. Okay.
12   A. -- as to who --
13       MS. CHRISTIE: John, can I -- can I just help
14 out here?
15       MR. MARIGLIANO: Sure.
16       MS. CHRISTIE: I -- I don't want to hijack
17 your cross, and I'm -- I just think I can probably
18 clarify it.
19       MR. MARIGLIANO: That's fine.
20       MS. CHRISTIE: And I don't want to waive any
21 objection for preparation of litigation. I just can't
22 do that.
23       MR. MARIGLIANO: I understand.
24       MS. CHRISTIE: But at the same time, I feel
25 like I'm watching arrows fly through the air that

Page 105

1 aren't making contact.
2       So we don't -- I don't have an objection to
3 producing the photos that were obtained. They're not
4 of this chair. And the way that the requests were all
5 done were produce photos of this -- of this particular
6 chair. They don't have photos of this particular
7 chair. What they do have are photos of the same lot
8 chair. It's the same style. It was the other
9 chair --
10       MR. MARIGLIANO: Right.
11       MS. CHRISTIE: -- that's of the -- you know,
12 there were two chairs up there. So it's not the
13 broken one. It's the one that's intact.
14       MR. MARIGLIANO: Okay.
15       MS. CHRISTIE: So when you're asking for
16 photos of this chair, they don't have photos of this
17 chair other than the ones that Mr. Germain took.
18       MR. MARIGLIANO: Okay.
19       MS. CHRISTIE: They do have photos -- and
20 that's what is provided in the e-mails -- of a similar
21 chair.
22       MR. MARIGLIANO: All right.
23       MS. CHRISTIE: And I don't have issues with
24 producing --
25       MR. MARIGLIANO: Okay.

MATTHEW GERMAIN vs TOPGOLF USA ALPHARETTA
CARRIE CULBERTSON on 10/25/2018

Page 106

1    MS. CHRISTIE: -- those.
2    MR. MARIGLIANO: I appreciate that.
3    MS. CHRISTIE: But I don't -- I'm not going
4  to produce the e-mails because those contain
5  communications about the investigation.  And I'm not
6  going to produce those, and we've objected to that in
7  discovery.
8    MR. MARIGLIANO: Okay.  Do you all possess
9  the second chair still?
10    MS. CHRISTIE: We do.
11    MR. MARIGLIANO: Okay.
12    MS. CHRISTIE: We took that as soon as we
13  found out that the original chair was missing.
14    MR. MARIGLIANO: When you say "took it," you
15  mean just --
16    MS. CHRISTIE: We took it.
17    MR. MARIGLIANO: -- put it to the side
18  somewhere?
19    MS. CHRISTIE: I took it.  It's in our
20  office.
21    MR. MARIGLIANO: Okay.
22    MS. CHRISTIE: What -- we have possession of
23  the chair.  And the reason it -- not this chair, not
24  Mr. Germain's chair.
25    MR. MARIGLIANO: The second one.

Page 107

1    MS. CHRISTIE: We took possession of the
2  second one because of the fact that they could not
3  locate this one.  And when we found out they could not
4  locate it, we sent a lawyer to go get the other
5  chair --
6    MR. MARIGLIANO: Okay.
7    MS. CHRISTIE: -- because I did not trust
8  that the second one -- you know, we just didn't want
9  to take a risk.
10    MR. MARIGLIANO: And that's the chair I
11  assume we're allowed to look at.
12    MS. CHRISTIE: Yes.  Absolutely.
13    MR. MARIGLIANO: All right.
14    MS. CHRISTIE: And it's the same -- it's the
15  same design.  It's the same -- it -- it -- everything
16  is the same, but it is not this particular chair.
17    MR. MARIGLIANO: Understood.  Okay.
18    MS. CHRISTIE: And we don't know where that
19  one is.
20    MR. MARIGLIANO: Got you.  Fair enough.
21  BY MR. MARIGLIANO:
22    Q. All right.  We're almost done.  I said that.
23    Other than what you -- you've described a
24  process by where you obtained information and sent it
25  on.  Do you know if there were two, three, or four

Page 108

1  cycles of doing that, or was it kind of one time you
2  did it and that was all you did with relationship to
3  this case?
4    A. To be honest, I don't know.
5    Q. Okay.  And I just want to be absolutely clear
6  now.  Do you recall talking, communicating, texting to
7  anybody where they expressed opinions to you, other
8  than lawyers, about what happened to Mr. Germain and
9  how this incident occurred?
10    A. No.  I do not have any communication with
11  anyone.
12    Q. Okay.  As you sit here today, you don't know
13  how this incident occurred.  Fair?
14    A. Fair.
15    Q. All right.
16    MR. MARIGLIANO: Anything else?
17  I'm good.
18    THE WITNESS: Okay.
19    MS. CHRISTIE: Okay.  Thank you.
20    THE WITNESS: You're welcome.
21    THE VIDEOGRAPHER: The time is -- the time is
22  2:35 p.m.  This concludes the video deposition.  We're
23  now off the record.
24    (The deposition adjourned at 2:35 p.m.)
25    (Signature reserved.)

Page 109

1                   C E R T I F I C A T E
2    STATE OF GEORGIA        )
                             )
3    COUNTY OF HENRY         )
4         I hereby certify that the foregoing
5    deposition was taken down, as stated in the caption,
6    and the colloquies, questions and answers were
7    reduced to typewriting under my direction; that the
8    foregoing transcript is a true and correct record of
9    the evidence given.
10        The above certification is expressly
11   withdrawn and denied upon the disassembly or
12   photocopying of the foregoing transcript, unless
13   said disassembly or photocopying is done under the
14   auspices of AHReporting, Certified Court
15   Reporters, and the signatures and original seal is
16   attached thereto.
17        I further certify that I am not a relative
18   or employee or attorney of any party, nor am I
19   financially interested in the outcome of the action.
20        This, the 1st day of November, 2018.
21
22                      Anne Hansen
23                      Anne Hansen
                        Registered Professional Reporter
                        Certified Court Reporter, #2711
24                      Commission expires 3/31/2019
25

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MATTHEW GERMAIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| vs. | ) | |
| | ) | FILE NO.: 1:18-cv-03593-AT |
| TOPGOLF USA ALPHARETTA, LLC and | ) | |
| TOP GOLF USA INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

This is to certify that I have on this date served all parties in the foregoing

matter with a copy of **RESPONSE IN OPPOSITION TO MOTION FOR**

**SANCTIONS** with the Clerk of the Court using CM/ECF system, which will

automatically send an e-mail notification of such filing to the following:

David H. Glass, Esq.
Law Office of David H. Glass
PO Box 674283
Marietta, GA 30006-0072

Daniel Prieto, Esq.
Jonathan Marigliano, Esq.
Prieto, Marigllano Holbert & Prieto, LLC
Two Ravinia Drive, Suite 1330
Atlanta, Georgia 30346

This 29th day of April, 2019.

*(Signature on following page)*

16

RUTHERFORD & CHRISTIE LLP

/s/Carrie Christie
Carrie Christie, Esq.
Georgia State Bar No.125248